Good morning, Your Honors. May it please the Court, my name is Deborah Bonds, and I'm a Deputy Attorney General who represents the petitioners, the California Department of Water Resources in the State Water Project in this case. Before the conclusion of my time today, I would like to reserve five minutes or so for rebuttal. The case before the Court is really very simple. What we're here asking this Court to do is to ensure that the Federal Energy Regulatory Commission, or FERC, to do its job. In this case, FERC has abdicated its statutory duty, it's not done its job, that of ensuring just and reasonable rates and open, non-discriminatory access to the grid. Now, there's really a dispute over what can be included in the cost base, right? Correct, in the transmission cost bases, yes. Is the method used by FERC to calculate cost base now a method that's used for other transmission cases not involving PG&E? Absolutely. It is used, as indicated in all the briefs before the Court, the current method of rolling in or socializing the gen-tie cost, to use PG&E's term, is used in other parts of the country. So why can't they use it here? Well, I think that one of the key distinguishing factors in this case, Your Honor, is that for decades, PG&E had used a sub-functionalized rate method. They called them all transmission rates. They didn't follow with that at all. But what they did do, previous to this case, is in their transmission rate setup, they had five sub-categories. And one of those sub-categories was the gen-tie category, the cost of bringing generation to the grid. And under that more accurate direct cost allocation system, third-party generators, like the State Water Project, did not pay for costs they did not account for. I understand that. The system that they had was more advantageous to you than the system that they now have. But I'm asking, well, what required them to stick with that old system if most parts of the country, maybe as far as I can tell all other parts of the country, used the roll-in basis that's now being used that you don't like? Actually, Your Honor, it's not only, quote, more advantageous to the State Water Project, but to any third-party generator. The current system specifically benefits PG&E generator subsidiaries and former PG&E subsidiaries. Okay. I'm even willing to go along with this. It may be advantageous to everybody who's seeking to use the transmission lines of PG&E. But my question remains, if all the rest of the country is allowed to use the roll-in system that you don't like, why is PG&E required to stick with its old sub-function, which brings in less revenue? I think there are examples of situations throughout the country. We've discussed them in our briefs. And as recently as the end of November of last year, there are other direct allocation systems in the country. I will... My question then remains, you're not quite getting to it. I gather that it is a system widely used, this roll-in system. That's accurate. Why can't PG&E use the roll-in system that's widely used elsewhere? Well, actually, Your Honor, I don't think the State Water Project's argument is that they can't use it under any circumstances. What we are saying in this case, they're changing from a decades-old system that was a more accurate direct allocation of these costs to a rolled-in, socialized system that benefits these former PG&E subsidiaries and current PG&E generation subsidiaries. What FERC has not done here, they have not provided any valid reason in law or in fact for this system to change so that third-party generators, such as the State Water Project, have to pay these costs they have not incurred. Well, when you say they haven't provided a reason for change, that sounds to me like an argument that they have a system that they've previously specifically approved, and therefore they need to give an articulated reason to justify the change from a system they've previously approved. Yet, as I read the briefs, they say, well, it was never litigated before. Well, actually, it was litigated before. And I think that, as I prepared for today's argument and reviewed the briefs, I think that the parties are all in agreement that this system, the prior system, has been in front of FERC previous to this. I understand it's been in front of them, and the rates including that, with the sub-function system, have been approved. Correct. But was the propriety of the sub-function system litigated, or was there ever any holding that the sub-function system was required? There was at least one situation where there was a hearing in front of an administrative law judge, and FERC ended up adopting the approval of the sub-functionalized system by the administrative law judge. And I believe in that situation, and it is discussed in our briefs, PG&E never filed any exceptions or objected to that holding of the ALJ to FERC. So it has, in fact, been litigated. Was PG&E in that circumstance arguing for a roll-in system? Yes, they were. Now, there was a piece in the brief that was pointed out where it was contended that there was a strategic ellipsis. Are you familiar with that argument? A strategic ellipsis. Yes. Maybe the Court could elaborate on that for me just a little bit. Well, the argument is that there was a strategic ellipsis from the brief prepared for your side that said PG&E represents, and that part was left out. And it simply said this is the system instead of – and it was argued in your brief, which I think you did not write. That's correct. That this was a specific endorsement by FERC of this method rather than a statement that this is the method that PG&E relies upon. Your Honor. Could you respond to that? I think that's a distinction without a real substantive difference. I don't agree. That is to say it's very different if it's a position of PG&E compared to it's a position adopted by FERC. Well, I think really the focus here is on what is FERC's job. FERC is the agency that's charged with ensuring that all these rates are just and reasonable, not PG&E. Now, I confess I didn't go back and check, but could you just tell me were those words omitted as represented in the brief by the other side? I might bring that back to you on rebuttal if that would work, Your Honor. Okay, thank you. So, in any event, as we go forward, what we have here is a situation where FERC has again allowed this decades-old system, which is a more accurately allocated cost to generators, to the system where it's rolled in and socialized. And it's our position that FERC has deviated from its own policy, articulated in Order 888, which required sort of the unbundling of costs. For example, the unbundling of transmission versus generation costs. There's other orders that's discussed in our briefs that follow this line of policy that FERC has articulated in other situations. Again, as recently as the end of November in 2006. Basically, FERC has approved a more accurate direct allocation of costs between to ensure that the folks that incur those costs pay those costs as opposed to having them be socialized. FERC does not always mandate a rolled-in rate system. They can, but they don't always. And there are examples in our briefs that provide that to the court. Some of the legal points that we would like the court to focus on would be that we think FERC's orders in this case violated both the Federal Power Act and the Federal APA. This is not an example of recent decision-making. FERC hasn't, I think, in the vernacular, showed its work as to how it got to the conclusion it got. There were conclusory statements from FERC about how an integrated grid provides a more reliable grid. While that may in itself be true, if that were the case, then does that mean that the prior system created a less integrated or a less reliable grid? We think not. This is not a physical change in the grid. This is an accounting system. This is a cost allocation system. Now, physically, what's going on? I mean, I understand there are three different kinds of transmission lines or facilities that may be at issue. One is these various loops. Correct. Diablo Canyon and Moss Landing and so on. Okay. The second one is a sort of a dual function system. Correct. And the third is the dedicated that at some earlier time might have been used for generation transmission but is no longer. Correct. I think your strongest case is obviously these loops. Correct. Absolutely. But I gather on the facts that these loops do serve some transmission function. Is that right? Absolutely, Your Honor. And we have no quarrel with that concept. They have the capacity to serve some network reliability functions. And I believe in the record there's testimony to the effect that perhaps anywhere from 80 to 100 percent, the potential for that is anywhere from 80 to 100 percent of their full capacity, which means 80 percent of Moss Landing, Morro Bay, Diablo Canyon is used for generating electricity. That is the bulk, the majority, their, quote, primary purpose, as it were, for being. Had the generators not been there in these locations on the coast of California, chances are PG&E would not just be building transmission lines willy-nilly through the Central Valley backbone to the coast. The main purpose, the primary purpose under PG&E's own well-studied, well-thought-out, pre-rolled-in cost scenario, they themselves say have established a good factual basis for the fact that the primary purpose of the lion's share, what we're talking about here today, are used for generation, and these Gentile lines are used to bring the electricity to the grid. They can be used for network reliability. Now, more than can be, are they in fact sometimes used? I think there is evidence in the record that says that on a contingency basis they can be used. I asked you a different question. Are they in fact sometimes used? That, I would, I assume yes. They are probably in fact sometimes used. To what extent, and I don't have a date off the tip of my tongue as to when they were used, but I do believe the record does show that there is a possibility that they can be used, and I think PG&E talked about that. I keep emphasizing I asked you a different question than can be. I asked you a question whether there's evidence in the record that they are in fact. I don't recall standing here right now where they have given us a specific date when they were in fact used for network reliability. I believe the record discussed in terms of contingencies. So in any event, we also maintain that FERC didn't require PG&E to meet its, FERC's own test in making this accounting change, and that test is whether the ISO, the California ISO, has control over the facilities and whether these rates are just and reasonable. And I think that in the briefing there's ample evidence and argument that the ISO really doesn't have control over these facilities. We're not even sure which facilities we're talking about with some of the smaller facilities. There's been problems with the maps. There's no ---- I may be mistaken on this point, and I'm asking for education. I thought that the order that this be included in the rate base was contingent upon establishing that ISO did in fact have control. I think that's accurate, Your Honor, but I think how the first one ---- So what's that do to your argument when you say they may not have control? Well, if they don't have control, then it's not included in the rate base. That's correct. If I recall correctly, FERC asked PG&E to make a compliance filing after the fact to show that these facilities were under ISO control, which again says to us that FERC didn't know at the time these opinions were written, the three opinions were written, they didn't know whether or not the facilities in question were under ISO control. Otherwise, they would not have had to have asked for a compliance filing. They put the cart before the horse, as it were. And what we're ---- At a minimum, what we're asking this Court to do is to remand this case back to FERC to show its work, to show why this change from a more accurate accounting system to a more generalized accounting system is appropriate under the Federal Power Act and under FERC's own regulatory structure. At best, we would ask this Court to direct FERC to adopt the ALJ's initial decision, which is what we do agree with that initial decision at this point in time. But basically, the result of what has happened in this situation is that PG&E's generating subsidiaries and its former generating subsidiaries have received an unfair discriminatory market advantage by not having to pay those costs that bring their generation to the grid. Other third-party generators have had to absorb those costs. And, for example, the State Water Project is a third-party generator. We have to pay our own costs. We don't have our costs socialized in. And we don't know of other third-party generators who are receiving the same benefit that PG&E's former subsidiaries are. If we were to agree with your position and with the position reached by the ALJ in this case, would that require FERC to require, in turn, that other utilities use the old PG&E sub-function test? No, it would not. It's almost as if PG&E – let me approach that from a different angle. FERC can look at this. FERC, as an administrative agency, has the ability to look at the scenarios throughout the country. And what might work in one part of the country might not work in another part of the country. PG&E put forth this sub-functionalized system itself. It strikes me that the sub-function idea is a very good idea. We agree. And it strikes me as though any large utility will have a system that will be very amenable to this system. We agree. Well, then I come back to my question. If that is so, wouldn't a holding here that says that in this circumstance, the PG&E sub-function system for cost accounting has to be adopted, why is that not generalizable across the country to all large public utilities with a lot of transmission lines? It certainly could be generalized. And I didn't ask could. I said must. Why must it not? My understanding of how this would work would be if this Court were to make that kind of a decision or that type of an opinion, issue an opinion saying that FERC has to either adopt the ALJ decision or explain why the new system is just and reasonable and meets the regulation under the Federal Power Act and FERC's own regulatory scheme, then that would certainly give other third-party generators additional ammunition to address rolled-in system-making schemes across the country. And if FERC were to find on a case-by-case basis that the sub-functionalized type of system was just and reasonable, didn't denigrate the reliability or integration of whatever grid they're dealing with at that part of the country, then it's very likely this could spread across the country. Yes, that certainly would be an additional piece of authority that would ensure a more direct and accurate cost allocation system. We're talking about an accounting system here. Now, you wanted to save some time. Just to alert you, it's page 23 in the red brief, which refers to pages 37 and 38 in your brief. Great. Thank you so much, Your Honor. I do have one question. I would like to determine the significance of this case. We have order number one, two, and four have all been settled. So we're talking about order number three. That involves, if I understand it, 132 million in facilities that were put in the right place. Is that right? I believe that's correct, yes. Yeah. If order number four would apparently have settled that as to PG&E, wouldn't it? When you say order number four, you mean a FERC order number four? Yeah. If they were to come out with a fourth order? Yes. It would depend on what that order would say. If FERC, in a fourth order, were to fully explain the factual and legal basis why this change in accounting is just and reasonable and meets the Federal Power Act and FERC's own standards, then we would have a much, arguably we could have a much harder job here on appeal in front of you. So it could settle that. It remains to be seen. The State Water Project takes the position that the evidence isn't in the record, nor is the law in favor of FERC making that kind of finding. But it would remain to be seen. We just don't know because they didn't do it. Well, I'm puzzled as to how FERC could have gone ahead with the same process and having been settled among the parties as to whether that's still an issue that has presidential effect for this 10 months that are involved with order number three. Are you referring to the retail rate versus the wholesale rate issue? No. I'm referring to the fact that if the method that FERC used, if that being a part necessarily of order number four, how would this order number three for the 10 months that are involved there have any large presidential effect? Well, it may not, depending on what order number four would say. It's really ‑‑ I'm having a difficult time answering your question in the abstract because we don't know what FERC would put in that order. We would only know if ‑‑ FERC has made the order, has it not? Well, I think maybe I'm confused as to what you're asking me, and that's certainly possible. I know in this case here we've got order 466, 466A and 466B, correct? Yeah. Okay. Right. And you're talking about maybe there would be a 466C, right? Am I following you here? Well, there was a fourth order. Okay. I will ‑‑ again, maybe I can address that on rebuttal. Okay. Thank you. Thank you. Any other questions at this point? Thank you. We'll just hear from you on rebuttal then. Thank you. Good morning. May it please the Court, I'm Carol Banto representing the commission. Time permitting, I'd like to cede three minutes to interveners' counsel at the end of my time. I will begin by clearing up. I think there was some miscommunication between Judge Hugg and petitioner's counsel. I believe you're referring to the T04 transmission rate filing. There were the filings 1, 2, 3, and 4. So it's not ‑‑ I think petitioner's counsel is understanding that to be a reference to a fourth order in this case. My understanding, and I don't know a lot of the details, is that the T04 rate filing, which is an entirely separate rate filing that was handled separately by the commission, was settled, and the parties have preserved this 10‑month period that's covered by the T03 rate filing. They've preserved their dispute in that regard, and I think if the court were to change, to reverse the commission, if something different were done, I believe there would be just a refund issue or a money amount for that isolated 10‑month period. Does that answer Your Honor's question? It does. Would it have a percentual effect for the future? Surely, I think, and this will get me to Judge Fletcher's questions as well, if the court were to agree with petitioner's counsel that approving this rolled‑in rate treatment is not just unreasonable, then, yes, it could have great implications. I assume for that case, although if it was resolved by settlement, that might be locked in regardless of ‑‑ I don't actually know the answer, and perhaps intervener's counsel can answer that. I hope so. Returning to some of the questions that ‑‑ I'll take my lead on the questions that you were asking petitioner's counsel. This is a Section 205 case. PG&E came in with a Section 205 filing. The commission's obligation in that situation is to determine is this just and reasonable, not is any other way of doing this unjust and unreasonable, or more to the point, is doing it this way as opposed to some other way necessarily unjust and unreasonable. If the rate treatment that is brought before the commission is just and reasonable, then the commission must approve it. Let me ask you this. It strikes me that the PG&E, the original system they had of some function, that strikes me as a better system that more accurately reflects the costs allocable to the particular transmission that's being bought. Is that wrong? The commission, because it never determined, the commission never answered that question. The commission never ‑‑ I'm asking you that question. I don't know, because I know the commission has policy reasons for choosing to do it. There could be detrimental effects to that. There could be ‑‑ I know that, and I don't want to go too far afield, but in the generator interconnection context, which, as I'll explain, this is not, in the generator interconnection context, the commission is very conscious of the transmission provider's ability to discriminate against new incoming generators by imposing costs on them, and there's ‑‑ so I don't know the answer to that. As to the point that the petitioners argue that it is a more precise cost allocation, the commission has never answered that, because it never litigated whether this was, in fact, as PG&E represented when it was using this method, a more precise method. The commission never ‑‑ I have trouble seeing why it's not going to be a more precise method if PG&E is using it to its own detriment. Well, it may be, but in the absence of a commission finding that this is, in fact, more precise, I don't have the expertise in the area to tell you. If it could be shown that the PG&E subfunction system is a more precise allocation of costs, how can it be just and reasonable to use what we then know is a less precise and more disadvantageous method of allocating costs? That doesn't sound very just and reasonable to me. Well, I have two answers to that. One is that, as we cited in the Midwest ISO case, the courts have said, I believe the D.C. Circuit said, but the courts have never required PERC to do exact cost allocation. Now, here in the law ‑‑ I didn't say exact. I built a little wiggle room into the question, which was to say, assuming that we can show or that the generators, generators can show that the old subfunction system is much more accurate, why is it just and reasonable to use the much less accurate and more disadvantageous cost allocation system? Well, I think it's a policy determination the commission has explained in a long series of cases that because the integrated transmission grid, a full, widespread, well‑built, resilient, reliable, robust integrated transmission grid is to the benefit of all users and it's made the policy determination that it is reasonable and the best way the commission has come up with to pay for that is to allocate it across the entire user base. So it's a policy determination for which the commission deserves deference. That sounds a little odd to me. And it sounds as though there's no real dispute about this, particularly as to these loops coming in from Diablo Canyon or Moss Landing or Morro Bay and so on. Those loops are primarily designed for and are used to transmit power from the generator into the main transmission backbone. And they may have an additional function of sometimes carrying surplus power, of being a sort of a residual, a residuary carrying capacity. I understand they've got a capacity for the entire, but their primary function seems to be, without dispute, to transmit power to the central grid. And why is the full cost of that loop allocated to somebody who's not transmitting power over that except maybe in the contingency situation? Actually, there is evidence in the record, substantial evidence in the record that those loops do other functions in terms of bringing power in and out of areas of the transmission. I understand that. And not just the small amount. Let's just assume for purposes of example that 80% of the function of Diablo Canyon loop is to bring power from Diablo Canyon into the central system and 20% is used for other. Why is the full amount of that allocated to third-party generators? It's not allocated. It's allocated to all user-handed transmissions. Why is the full amount of that put into the cost base that a third-party generator has to pay when only 20% of it is even potentially used by that party? Assuming that scenario, because I'm not sure that's exactly what they have in mind. It may be 19 and 81, but assume roughly those numbers. The commission has made the longstanding and consistently applied and approved policy determination that it is better for the health of the overall grid and the development of a strong transmission system to do it this way and to not. Is there another court of appeals opinion that has been presented with this question and has approved the FERC allocation roll-in system? Well, the roll-in system absolutely has been approved, including in cases that we cited, the Entergy case. The Midwest ISO case was not about that in particular, but it took that principle that it benefits all users of the grid. I understand that there's benefit. There's no question there's benefit. The question is how much they have to pay for it. Well, that's what these cases deal with. The Western Massachusetts case, I don't want to leave that one out. The parties who believe that there's something that is being rolled into the rate base that they're not actually using, that frequently challenge, that's what all these cases are about. They say these cases, the more recent cases, tend to be about upgrades to the system that were made in connection with a new generator being put onto the system. That's where it tends to arise, because this larger question of just the roll-in of the basic facilities, because as petitioner's counsel concedes, virtually most, if not all, I don't want to say all, but most utilities across the nation, including in California, including under the ISO system, do use this roll-in. So these were resolved years ago. So the more recent cases you see are these, the transmission provider had to make certain upgrades to the system. And you get other users of the system saying, those upgrades didn't benefit me, that's in a whole other part of California that has nothing to do with me. The commissioners said, and the courts have upheld, that yes, the transmission grid, it's not like a load, it's a dynamic, consistently flowing. I understand that. I'm a bit of a technical nitwit, so I may be explaining this or giving my example in too simplistic terms. But I think it may be accurate to say that the function served and the advantage provided to the general system and to the third-party generators, such as California Department of Water Resources, provided by, for example, the Moss Landing Loop, could be provided at much less cost than is now being cost to do the entire generating loop. That is to say, that capacity, that resilience, and so on, that's provided to the system, you don't need all the wiring capacity that's in that generating system because, for the purpose of my example, 80% of it is being used to transmit the other power. So why are we putting that additional 80% into the cost base? Well, the answer I can give, Your Honor, the commission has made a policy decision, and the question for the court is whether it's a permissible one. Well, its longstanding has been approved by other courts. It is not at all presented in the first instance here. And to the extent that you can make arguments that a primary purpose, for example, test, would be better or more desirable, that's not really something that I'm not in the position to give you the pros and cons of that. And the question is, is the court in the position to say that the commission is wrong? And when you're looking at... Except that apparently in two proceedings, at least, Northern States and Kentucky Utilities, the commission went the other way. No, and I'm glad you brought those up, Your Honor, because as the commission distinguished those in the 466A order, I would raise, just in passing because I don't want to dwell on it, the jurisdictional point that once it gave its rationale with which Petitioners clearly disagree, they did not raise that disagreement on rehearing. But the commission's distinction in 466A still stands. Kentucky Utilities involved facilities that the commission found specifically are not part of the transmission grid, do not serve any transmission function apart from exactly what they're doing with the generator. And that's the distinction that the commission made in Order 466A in this case. They said, in Kentucky Utilities, we made a finding that the generation step-up units or step-up transformers in that case were not part of the integrated transmission grid and did not perform any other transmission function whatsoever. And so Kentucky Utilities is not opposite. It's not that it was wrong. It's not that the commission has changed its mind or done something different. It's an entirely separate scenario. As for Northern States, that, I believe, as the commission explained it, was a provider or a utility that wanted to actually refunctionalize generation facilities into the transmission rate base, and the commission said you might be able to do that if you made the right showing. You didn't make that showing here. As petitioners have made clear, although not always in their briefs, we're not talking about refunctionalizing something from a generation function to a transmission function. We're talking about transmission rates and whether we should break them out further or roll them in. But it is not like Northern States, where there's talk of clearly generation facilities, whether they should in some way be refunctionalized, transformed, become treated as transmission facilities. Let me ask a sort of a more general question.  is a major generator of electricity and a major third-party generator that seeks then to use the transmission lines, but there are going to be others as well. And it strikes me that if we were to uphold the FERC order and the roll-in system here, what we're asking California Department of Resources and other third-party generators to do is to provide some subsidy to the overall system. Now, the amount of the subsidy may be in dispute. It may be that FERC is arguing, yeah, but it's so hard to calculate in some other way that it's a reasonable subsidy to ask them to do. I mean, we know there are all kinds of cost subsidies that show up in rate regulations and so on. What does this do to various forms of alternative generation of electricity? That is to say, it strikes me that if there is a subsidy, you are loading onto various forms of alternative generation a cost that really is not theirs, but is rather a subsidy that they're being required to pay. Is there a justification for doing that? Well, I have a couple of answers to that. And I think the more direct answer... Wind, you know, all kinds of various forms of generation. I think the more direct answer to that is, and the orders and cases that we've cited discuss this somewhat, that there's actually concern that if you functionalize, sub-functionalize, if you put these rates directly on generators, there is concern about discriminating against those new ones coming in. Instead of paying their share of the entire transmission grid the way everyone else does, you would have a separate category that applies just to them. They're still paying for the rest of the transmission grid as well. And I know I'm getting above my depth here. It really is a policy issue. I'm not sure I understand your point yet. Could you start? Something went over my head. Well, and it may be that it's going over mine as well, which is another reason I keep coming back to the commission making a policy decision in designing rates. I understand they made a policy decision. The question is whether it's a permissible policy decision. Right, but I know that there is some reference, and I have my cases back at the table, but there is some discussion in we cite the Northeast Texas case as one of the cases that says this roll-in is fine and it makes sense. And the 2004 decision in the Northeast Texas, which I believe involved upgrades being made to the transmission system to benefit a particular generator, and the commission said we spread these across the whole system because they benefit the system as a whole. But there's also a footnote, and I can give you the exact site if you'd like, but there's a footnote in Northeast Texas that says the reason that we stay away, have generally been very wary of direct allocation of costs, is the barrier to entry for new generators when the facilities that are built to benefit their generator coming online are directly slapped onto them. And that by spreading them across the users of the grid, we actually remove barriers to entry. So if I'm understanding the commission's order right, I think that answers Your Honor's question, that those wind generators are able to have that barrier to entry removed, and they pay their share along with everyone else. I understood the briefs, but I'm a newcomer to this field. I had understood from the briefs that California Department of Water Resources and other third-party generators are required to pay for their own interconnection to the system. Interconnections, but in addition, when a new generator interconnects to the grid, and this is where the order number 2003 that they rely on and some of the other discussions come in, you build your own facility to the point of interconnection. Correct. But the transmission provider also has to make certain upgrades to the transmission network to, and here I get above my depth as well, to maintain the resilience of the network, to allow the network to take the power that you're then sending. So when a new generator, yeah, they build their own line that connects up to the network. There's a whole other area of policy called the at or beyond point that is well beyond this case, but there are changes that are made to the grid as well when a new generator comes online, and the commission has said all the users pay for those upgrades, not the new wind generator that's connecting, but those will be shared across the entire grid because they benefit the entire grid, and we don't want to have barriers to entry to that particular generator that's coming online. Does that help? Does that explain it? Well, that helps, thank you. Yeah, oh, sure, sure, that helps. And the larger point that I would make, even if the court has doubts about the wisdom or the policy implications of the commission's policy, this is a pricing policy that's been in place for years. It is generally and routinely approved across the country. The commission has great deference both on the engineering issues and as well as the policy decisions, and this was a section 205 filing where the commission just had to say, is the filing in front of us just unreasonable? And having been holding for 20-some years that this kind of filing is just unreasonable, once you have the undisputed facts, and I would emphasize the facts found by the ALJ are not in dispute, that every one of these facilities does perform some function in the integrated transmission grid, then was it unreasonable for the commission to say you come in with the facts? The question is, is it close enough for government work? I got it. I wouldn't put it that way, but I'll accept it. Okay, and you wanted to save a little time for the intervener. Unless you have further questions. Let me just ask one question. This Order 466, as we discussed with your point, required a compliance filing to be made. Right. Has that been made? My understanding is that it has, and I'm glad Your Honor brought that up. Of course, with Order 466, the commission realized it had made a mistake in putting the sole emphasis on ISO control. It fixed that. The rehearing requirement functioned exactly as intended, and as I think Your Honor was asking earlier, the commission decided the rate treatment, looking at these particular facilities, but there was still the additional requirement that PG&E show that it actually had transferred control. I believe an intervener's counsel can speak to this, but the compliance filing was made, and I think the ISO control issue has been resolved. I'll ask the PG&E counsel. Thank you. Thank you. May it please the Court. Mark Patrizio, Pacific Gas and Electric Company. I'd like to pick up with Your Honor's questions about whether the rolled-in rate is an appropriate policy decision for FERC to make. And picking up on something counsel for the commission said about barriers to entry, I wouldn't have framed it in just that way, but the reason FERC has gone to rolled-in rates and has consistently said that's a good thing, including for third-party generation, is under a rolled-in approach and under the commission's consistent rulings regarding what portion of costs a generator shall bear to interconnect its generating unit to the grid. The generating unit pays for what is called a generation interconnection facility. It is a radial line, a single line that goes from the generating unit to the first point of interconnection with the integrated grid. For that length of a single radial line, the generator is responsible for the cost under what's called a special facilities agreement. After that point of first interconnection with the grid, all network, part of the integrated network and all users of transmission service pay. The result of that is the generators who want to develop a new wind farm in a remote location or who want to develop hydro or other alternative energy are paying 100% of only that radial line. They then only pay their portion, which is a very small portion in the scheme of all users of transmission in California, of the typically more expensive facilities that are required to upgrade the network in order to accommodate that generation. So while appellate's counsel would argue to this court that the rolled-in method penalizes third-party generators, it is intended by FERC to do just the opposite, and I believe it has the effect of doing just the opposite. Overall, it decreases the amount the generating owner will ultimately pay in order to have the system able to receive its power and for that generator to be able to market its power. For that reason, the rolled-in rate is absolutely the appropriate policy position for FERC to have come to. They came to it years ago. The only utility that was doing anything else was PG&E, and historically the reason PG&E came to sub-functionalized rates was as an accommodation and a settlement with a number of large municipal and federal transmission owners to figure out a way to give them a break on some of their transmission because they were also bringing transmission facilities to the integrated network that made the whole network more robust. It was never a system designed to subsidize generation. I would point to the intervener's brief in support for the description at pages 15 through 17 of Mr. Jenkins' testimony concerning the loop facilities and the step-up transformers. Your Honor was talking about an 80-20 split, a hypothetical 80-20. You can't look at it that way. If these loops are taken out of network, lights go out. Load isn't capable of being served with the remaining facilities. These facilities aren't only used 20 percent of the hours of a year to keep those lights on. But is the full extent of those loop capacities used from time to time? Or is it only 20 percent of the capacity of that loop? There are times when the generating units at the end, the MOS landing loop, for example, when the MOS landing power plant is out of service, it's being used exclusively for network service. Yeah, I understand that. There is no generation function being served at that time. I understand that. But how much of that generating loop would be needed if all you were trying to do was build in the excess capacity that would be used for system resiliency? I doubt you'd have that powerful a loop if all you were ever using it for was simply system resiliency and you never had MOS landing. Am I right about that? There would probably be a different system configuration if the plant were not there. And that is true of every power plant around the system. But my point is, if MOS landing had never been built, but PG&E figured that for its overall transmission system it needed excess capacity, it never in the world would have built in that much excess capacity at that point. It likely would have built something that did not look exactly like what is there now. My point to you, Your Honor, is that's true with third-party generators. But you avoided my question when you said it wouldn't be exactly like it. If MOS landing were not there, the something that it did build that's not exactly like what it is, would it have had less carrying capacity than the loop now has? It likely would have. Mr. Greenfield, can you address my question about the compliance filing? Yes, Your Honor. The compliance filing was, in fact, made, and I want to be clear, there was at hearing a little bit of confusion about two, in particular two facilities, that the ISO was not able, the California Independent System Operator, was not able to say definitively at hearing it was operationally controlling. And so after the hearing, PG&E and the ISO worked to, essentially it was for PG&E to satisfy the ISO that, yes, these two facilities had been turned over to the ISO's operational control and were being controlled by the ISO. Neither of those two facilities was a large facility. It wasn't the loops. It wasn't the step-up transformers. They were small line segments. So it did take some time to get that compliance filing submitted to the commission because the ISO's nomenclature for these line segments was different than PG&E's and the engineers needed to get together and be sure that they all knew exactly what they were talking about. So that was the extent of the compliance filing? Well, we confirmed in the compliance filing that all of the facilities that we said had been turned over to the ISO's operational control had, in fact, been. But the long delay in getting that compliance filing done centered around these two small line segments. And finally, to answer Your Honor's question a little bit more fully, this is what we call T03, the third of PG&E's transmission owner rate cases. This issue we carved out for litigation before the commission for purposes of the 10-month locked-in period of T03. What you referred to, Your Honor, as Order No. 4, the T04 rate case, was settled in a black-box settlement, all issues. So this ruling would not have any effect on the rates during that period. And likewise, we have also filed at FERC and settled in a black-box settlement T05, T06, T07, and T08. We file them roughly annually because as we are building more facilities, we need to ask for an increase in rates to cover the cost of those facilities. For future rate cases that PG&E would file, were this court to find that these facilities should not be included in network transmission rates, it would have a forward-looking precedential effect. But for the purposes of this case, in terms of dollar adjustment, it would affect $4 million in revenue requirement for a 10-month locked-in period. I hope that helped. Yes, thank you. Thank you. Thank you. Okay. Response? Thank you, Your Honor. I'll try to keep this very brief. First, I would like to thank my opposing counsel for helping with Judge Hugg's question. I think that now we understand we're talking about the subsequent TO's orders. I do think, though, should we be successful in this case, that we have a difference of opinion with the respondents in terms of what the effect would be. We think that some of those settlements that Mr. Patricio referred to would allow for review of this issue, should this court remand this case back to FERC. I'd like to say, with all due respect, that the policy decision that FERC has made is, at worst, wrong, and, at best, it has not been explained. And I think just the discussion that the court had with opposing counsel illustrates that issue. Some of the issues I'd like to highlight here is that there's a question about the sub-functionalized system and whether or not that has been, quote, approved. I would direct the court's attention to 18 CFR section 35.13, which does provide in FERC's unregulatory scheme for a sub-functionalized type of scheme. I would also point out that this scheme that now PG&E is maintaining in FERC commission has said that it is, the old scheme is not good, it's wrong, it doesn't add to reliability, or grid integration was in place for over 20 years. It was in front of the commission at least twice. The commission has authority on its own motion to reach down and deal with a rate scheme that it feels is not just unreasonable. I would also like to address briefly the control issue. We maintain, the State Water Project maintains, that issue should have been resolved prior to the opinions, the 466A and 466B, it should have been resolved prior to that. But even if it had been resolved prior to that, we still have the just and reasonable prong, and that prong has not been met or explained by FERC in this case. In terms of alternative generators, that's not the situation we have here. In many of the cases cited by FERC in this matter, they do deal with third-party generations and in actual physical upgrades to the grid and new generation coming onto the grid, and that's where there has been more of a socialization of cost, and that's not the situation we have here. We also don't have a situation where we've got a third-party, a new third-party generator, a new wind generator, a new hydro generator, a new solar generator that's trying to come on the grid that is saying in order to promote this alternative energy, we need to have some of our costs socialized. If that situation were to come up, FERC could deal with that situation, and perhaps then it could explain a valid policy reason for socializing some of these costs. What we're talking about here is a change in accounting that advantages PG&E subsidiaries and former subsidiaries and disadvantages current third-party generators, including a public entity that reports to the taxpayers of California, the State Water Project. The State Water Project, as I know you're aware, transports water from northern to southern California and provides a crucial public need. It is not we are not responsible to shareholders. We're not out to make a profit. We're out to do our job, and we're asking this court to make sure FERC does its job and at best explains its decision or at worst explains its decision, which we think it would have a very difficult time doing to the satisfaction of any court, but at best would adopt the ALJ's decision, which is based in law and fact. It was presented at a lengthy hearing. Do you have any other questions? Yes. Could you address the strategically placed ellipsis question that I addressed to you earlier? I'm sorry, Your Honor. I got caught up in my opposing counsel's argument, and I did not address that. I could certainly follow up with a letter to the court on that issue if that would be helpful. Well, I'm not sure that is necessary. But the statement in the red brief is that the blue brief left out the language PG&E states that, leading into a quotation that if all you read was without the PG&E statement, it sounds as though that's an endorsement by FERC of that position. I see what you're saying. And if you put back in PG&E states that, it's merely a statement of PG&E's position. I think you did not write the blue brief. It's certainly not signed by you. Is that correct? That's correct. I think I understand what the question is. And this was raised in the red brief, and it was not responded to in the response brief. It's bad practice. I understand what you're saying, Your Honor, and we certainly will take that to heart in future briefs, and I can only apologize to the court for that omission. But what I would offer to the court is that even if those words had been there, I would ask the court to undo, make a finding or holding that the previous subfunctionalized system was not just unreasonable or did not meet FERC's regulatory or statutory criteria. If you could communicate with the author of this brief, that would be useful. Your Honor, that would be the first call I make. Okay. Is there any other questions? I'd like to thank this Court for the time. And, again, we just were asking this Court to remand this case back to FERC. Thank you. Thank both sides for a useful argument in a case that, as I'm afraid typically the case, this is not an area of particular expertise of federal judges. The case of California Department of Water Resources v. FERC is now submitted for decision.
judges: Hug, Tashima, W. Fletcher